IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HAROLD DICE, | : | |
| AUDREY DICE, and | | |
| DIANNE DICE, | : | |
|      Plaintiffs | | |
| | : | |
|      vs. | | CIVIL NO. 1:CV-08-0956 |
| | : | |
| CARL JOHNSON, | | |
| BRENDA MARINKOV, | : | |
| JERRY FISCH, | | |
| GREGORY SELTZER, and | : | |
| LIBBY WILLIAMS, | | |
|      Defendants | : | |

*M E M O R A N D U M*

I.    *Introduction*

      The plaintiffs, Harold Dice and Audrey Dice, husband and wife, owned a

farmhouse and outbuildings in Bethel Township, Pennsylvania.  In 2007, they lived at this

property with their daughter, Dianne Dice, also a plaintiff.  One of the outbuildings was a

wooden shed where nineteen dogs were kept, adjacent to a newly dug burn pit Harold

Dice was using to burn trees, brush and other flammable trash.

      On June 14, 2007, there was an inspection at the property for potential

violations of the Township code.  Tension arose during the inspection between the code-

enforcement officers and Dianne Dice.  That evening a fire in the burn pit spread to the

dog shed, killing eighteen of the dogs.  The day after the dog-shed fire a local humane

society agent told the local newspaper and other media that on the night of the fire he

could smell an accelerant on the dogs.  This assertion could not be confirmed by a later

law-enforcement investigation.  One week after the dog-shed fire, fire destroyed the

farmhouse.  A law-enforcement investigation into this fire could not rule out arson.

The plaintiffs filed this lawsuit against the following defendants: (1) Carl Johnson, the humane society agent, more specifically, a Lebanon County Humane Society animal investigator; (2) Brenda Marinkov, the Bethel Township code-enforcement officer and zoning officer, who conducted the inspection; (3) Jerry Fisch, a part-time code-enforcement officer for the City of Lebanon, Pennsylvania, who assisted Marinkov in the inspection; (4) Gregory Setzer, a police officer for the Lebanon County Humane Society, who issued citations for dog-law violations; and (5) Libby Williams, a New Jersey animal-rights activist who commented on the situation after reading news accounts on the web of the dog-shed fire.

The plaintiffs make the following federal civil-rights claims: (1) a First Amendment retaliation claim asserting that the inspection was in retaliation for the exercise of a constitutional right -- when Harold Dice had earlier told Johnson to stay off the property; (2) a Fourth Amendment claim asserting that the consent for the inspection was coerced, thereby rendering the inspection unconstitutional; (3) a First Amendment association claim; (4) a Fourth Amendment malicious prosecution claim for nineteen citations issued to each of the plaintiffs after the inspection for dog-law violations; (5) a Fourth Amendment excessive-force claim on behalf of Dianne Dice; and (6) a Fourteenth Amendment due process claim asserting the surviving dog was being kept from Dianne Dice. State law claims are also asserted for: (1) civil conspiracy; (2) assault by Marinkov; (3) malicious prosecution, and (4) defamation and false light, for the comments made by Johnson and Williams.

We are considering four motions for summary judgment filed by the defendants. Johnson and Setzer filed a combined motion, and the other three defendants filed separate ones.

II.     *Standard of Review*

Under Fed. R. Civ. P. 56, the moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The party opposing summary judgment "may not rely solely on allegations or denials in its own pleadings . . . ."  Fed. R. Civ. P. 56(e)(2).  Nor may it rely on statements in briefs.  *Smith v. Kyler*, 295 F. App'x 479, 481 (3d Cir. 2008)(per curiam)(nonprecedential)(quoting *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511-12 (3d Cir. 1994)).  "[R]ather, its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  "'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Colwell v. Rite-Aid Corp.*, __ F.3d __ , __, 2010 WL 1376301, at *3 (3d Cir. 2010)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

III.    *Background*

We have reviewed the parties' evidentiary submissions, the defendants' Statement of Undisputed Material Facts and the plaintiffs' Counter-statement of Material Facts, including their admissions of some of the defendants' statements of material fact. Based on the foregoing, the following is the record upon which we will decide the summary judgment motions.  At times we will borrow a party's language without attribution if it represents an undisputed fact.

This case begins with the June 14, 2007, search of Harold Dice's Bethel Township property.  That property included a single family house, a hog barn and several wooden sheds, including a dog shed.  (Doc. 44, Defs.' Statement of Undisputed Material

Facts (SMF) ¶ 3).  The shed was a one-story wooden structure, fourteen feet by thirty-two feet, with two windows.  One of the windows had an air conditioner in it.  The shed contained eight wire dog crates, four feet by four feet, and six wire crates, four feet by six feet.  (*Id.* ¶ 32).  Dianne Dice had bought the dog shed in the early 1990s and used it to contain the dogs that she was breeding for sale in the 1990s.  According to her, she was no longer breeding dogs in June 2007 and the nineteen dogs in the shed at that time were "leftovers" she was gradually selling off.  (Doc. 45-10, Dianne Dice Dep., CM/ECF p. 17).[1]

The Dices were planning to move to their dairy farm a few miles away, and in early June Harold Dice hired a neighbor to build a burn pit on the Maple Drive property so that they could burn brush and trees as a way of preparing the property for sale.  (Doc. 60-2, Harold Dice Dep., p. 14-15).  Harold Dice was not home while the neighbor dug the pit, (*id.*, p. 16), and Harold and Dianne Dice agreed the pit had been dug too close to the dog shed, (*id.*, p. 15; doc. 45-11, p. 13), although they differed on how far apart they were.  Dianne Dice said it was ten feet and Harold Dice said it was more like twenty or thirty feet.  (Doc. 60-2, p. 15).[2]  Harold Dice used the pit for ten days, including the day of the dog shed fire, June 14, 2007.  (*Id.*, pp. 20, 27-28).  The Dices used the pit to burn trees, brush, wooden furniture from the house, old tax documents, and newspapers and magazines.  (*Id.*, pp. 17-18).  According to Harold Dice, the burn pit was visible from the roads alongside the property.  (*Id.*, p. 26).

Defendant, Carl Johnson, was a Lebanon County Humane Society animal investigator.  As such, Johnson was limited to collecting information about animals -

---

[1]  All citations to the record are to the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than to the page numbers of the original documents.

[2] The Pennsylvania State Police Report on the dog-shed fire measured the distance as about thirteen feet.  (Doc. 60-11, p. 2).

animals in distress, lost animals, possible animal cruelty and related matters; he had no authority under state law to arrest, to request or execute warrants, or to cite individuals for animal cruelty. (Doc. 44, Defs.' SMF ¶ 5). Johnson's supervisor, defendant Gregory Setzer, was a police officer for the Humane Society and did have authority under state law to apply for search warrants and execute them and bring animal cruelty charges against individuals before magisterial district judges. (*Id.* ¶ 6).

Johnson and Harold Dice knew each other. In 2004, Johnson rented an apartment in a building owned by Harold Dice in the City of Lebanon, Pennsylvania.[3] Dice sued Johnson for eviction and non-payment of rent. Johnson said the apartment was uninhabitable after the ceiling gave way, in part with water coming in from the bathroom above. Johnson prevailed but Dice said only because he had forgotten about the hearing on his lawsuit and thus had failed to appear. (Doc. 45-2, Johnson Dep., p. 15-16; doc. 60-2, Dice Dep., p. 69-70).

At some point before 2007 (perhaps about July of 2006), Johnson received his first complaint about the Bethel Township property, from a neighbor "five houses down," and at a time when he did not know it was the Dices' property. (Doc. 45-2, Johnson Dep., pp. 23-24). The neighbor told Johnson that the Dices' property was in tremendous disrepair and that there were animals on the property that were suffering. When he arrived, Johnson could see and hear dogs "everywhere." As he pulled up and got out of his vehicle, the Dices told him to get off the property. (*Id.*; doc. 44, Defs.' SMF ¶ 8).

According to Johnson, in March or April 2007, Johnson investigated reports of a woman with several Great Danes, emaciated and suffering from gross alopecia, that

---

[3]  In addition to the Bethel Township property and their dairy farm, Harold Dice, sixty-seven years old, and Audrey Dice own a used car dealership, and more than fifty residential rental properties in Lebanon County and Berks County. Harold Dice has described himself as someone who owns $6 million in property. (Doc. 44, Defs.' SMF ¶ 1).

she said she had gotten from the Dice family.  (Doc. 45-2, Johnson Dep., p. 16, 17, 19, 20).  The woman told Johnson there were other dogs in similar condition still at the property.  (*Id.*, p. 16).  Based on his previous experience, Johnson knew there was more than one or two dogs on the property, so he arranged for Diane Buhl, the local state dog warden, to accompany him for any state-law violations.  (*Id.*).  Johnson and Buhl knocked on the front door and Johnson told the person who answered (either Harold Dice's wife or son) that he was there on a complaint and that he would like to see the dogs.  The person replied that there was "nothing wrong [there] with any dogs."  (*Id.*, p. 20).  At that point, Harold Dice came from the rear of the house, and as soon as he made eye contact with Johnson, told Johnson "to get the 'F' off the property" and that he was not allowed there.  (*Id.*, p. 20-21).

Dice has a different recollection of this encounter.  According to Dice, it happened in January 2007, and Johnson was there to "harass" him.  (Doc. 60-2, Harold Dice Dep., p. 12).  Dice "chased him off," telling him never to come back.  (*Id.*).  According to Dice, Johnson had no reason to get on him just because Johnson owed him money.  (*Id.*).[4]

According to Johnson, a few days before June 14, 2007, a neighbor of the Dices complained to him that she had been on the property and had heard the dogs yelping all night and that smoke was entering the dog shed.  She could also detect "foul smells and odors" coming from the shed.  (Doc. 45-2, Johnson Dep., p. 26).  The neighbor was identified as Natasha Kale, (doc. 45-3, Marinkov Dep., p. 5), who lived "in the next house back behind" the Dices.  (Doc. 60-2, Harold Dice Dep., pp. 12-13).

---

[4]  This is an apparent reference to the unpaid rent money, but it is difficult to understand why the person who owes money would be the harasser, and Harold Dice affirms that neither he nor his family initiated any other proceedings against Johnson until this lawsuit. (Doc. 61-3, Harold Dice Decl. ¶ 6).

Johnson drove by the Dice property and could see a burn pit in use within about six feet (his estimate) of the dog shed and also observed smoke entering the shed. (Doc. 45-2, Johnson Dep., p. 26). Because the burn pit raised issues related to municipal codes, Johnson contacted defendant Brenda Marinkov, the Bethel Township zoning officer and code-enforcement officer. Johnson was concerned about the danger to the dogs given the proximity of the burn pit to the shed. (*Id.*, pp. 26-27).

The day before the June 14, 2007, inspection, he and Marinkov viewed the Dices' property from an adjoining property. At that time, there was no fire in the pit, just some smoldering embers. The dogs could be heard yelping and they could smell the animal fecal matter emanating from the shed. (*Id.*, p. 27). Marinkov said that no application had been made to build such a large burn pit in close proximity to the shed. (*Id.*).

It was decided that they would visit the Dices' property. As Johnson saw it, they had a complaint from a neighbor and their own visual inspection indicating the dogs were endangered. (*Id.*). The problem was that Johnson was not allowed on the property, and Marinkov lacked experience as a code-enforcement officer. (*Id.*; doc. 45-3, Marinkov Dep., p. 8). Marinkov checked with the Township supervisors. They advised her to seek the assistance of Lebanon County or the City of Lebanon. (Doc. 45-3, Marinkov Dep., pp. 7-8). Johnson suggested that she contact Chris Miller, in charge of code inspections for the City. (Doc. 45-2, p.27). On the day of the inspection, Miller assigned defendant Jerry Fisch, a part-time code-enforcement officer for the City to assist Marinkov. Fisch was working that day because it was his day off from his full-time job as an optician. (Doc. 45-4, Fisch Dep., pp.7-8).[5] Johnson also contacted Diane Buhl, a state dog

---

[5] The City's code-enforcement officers have provided assistance to surrounding communities. (*Id.*, p. 6).

7

warden, because of the dog issues involved, and she agreed to go out to the property as well.  (Doc. 45-2, Johnson Dep., p. 27).

As a part-time City inspector/codes enforcement officer, Fisch had dealings with Harold Dice on a weekly basis because Dice owned a number of properties in the City.  (Doc. 44, Defs.' SMF ¶ 13).  Fisch and Harold Dice were friends; they had a mutual respect for each other and confided in each other.  (*Id.* ¶ 15).  Harold Dice estimates their working relationship went back ten years before June 2007.  (*Id.* ¶¶ 16 and 17).  In fact, Fisch had been sent to investigate the complaint made by Carl Johnson about the apartment he had rented from Dice.  Dice's workers fixed it promptly.  (*Id.* ¶ 14).  Fisch said that whenever code issues arose on his properties, Dice would take care of things right away.  (Doc. 45-4, Fisch Dep., p. 17).

On June 14, 2007, Fisch, Marinkov and Johnson met at the Bethel Township building around 10:00 a.m.  Buhl was not at the meeting but she met later that morning with Johnson.  Marinkov and Fisch left the Township Building for the Dice property and were followed shortly thereafter by Buhl. Johnson stayed behind, parked in a parking lot about a mile away from the Dice property. Johnson told the others that he could be in cell phone contact with them if necessary.  (Doc. 44, Defs.' SMF ¶ 26).  Until he was on his way to the Dice property, Fisch was unaware he was going to inspect property owned by the Dices.  (Doc. 45-4, Fisch Dep., pp. 12-13, 16).

When Marinkov and Fisch arrived at the Dice property, they could see the burn pit and hear the barking dogs. They knocked on the door of the Dice house.  The door was answered by Andy Dice, one of the Dice sons. After a few moments, Dianne Dice came to the door.  Marinkov and Fisch explained that they were building-code and zoning-enforcement officers and that they wanted to get onto the property with respect to three issues: (1) the burn pit; (2) whether the dog shed was a new structure that had

required a permit; and (3) the number of dogs on the property, indicating a possible illegal kennel. Dianne Dice refused access to the property and ordered Marinkov and Fisch off. (Doc. 44, Defs.' SMF ¶ 27; doc. 45-4, Fisch Dep., p. 15; doc. 45-10, Dianne Dice Dep., p. 36, 38-39).

Fisch countered that it was not her property; it was her father's, but if Harold Dice told them to leave, they would. (Doc. 45-4, Fisch Dep., p. 15). Harold Dice was contacted by phone. According to Fisch, he told Dice what they were checking for, but if he wanted them to leave they would. "So they talked some more." (Doc. 45-4, Fisch Dep., p. 16). Fisch again told him that he "was sent out by Chris Miller to assist Brenda to check into these violations." (*Id.*). Dice replied that Fisch had "always been fair with" him and "honest with" him and agreed to the inspection. (*Id.*, p. 17). But he said that they had to deal with Dianne about the dog shed because they were her dogs. (*Id.*). At one point, Dice might have asked if Carl Johnson was there, and Fisch said no. (*Id.*).

According to Harold Dice, Fisch told him over the phone he wanted permission to go on the property to investigate the three issues of the possible new construction, the burn pit, and the number of dogs. (Doc. 60-2, Harold Dice Dep., pp. 22-23). Dice did not see any need for it since Fisch was not from Bethel Township. (*Id.*, p. 23). But Fisch "kept insisting and insisting and insisting if (sic) you wish you would let us go on there if I have to go get a search warrant you wished you would." (*Id.*). Between Fisch and Marinkov, Dice was called five or six times, over a span of a half hour to forty-five minutes. They both said the same thing: "You better let us on there. You wished you would've." (*Id.*, p. 25). "[I]t was all always a threat," a threat to get a search warrant if he did not consent. (*Id.*). As Dice testified later in the deposition: "They made it real simple . . . You're gonna give us permission to let us on or we're going for a search warrant. But there was no question about getting a search warrant. And that's the way it is. You're

gonna do it or we're gonna do it.  So I gave 'em permission under pressure."  (*Id.*, p. 42).
Dice thought he had no choice but to grant permission because he thought (erroneously)
they did not need probable cause to get a search warrant, (*id.*, p. 52), and they
repeatedly said they were going to get a warrant.  (*Id.*, p. 53).  In a declaration submitted
in opposition to summary judgment, Dice adds that Fisch and Marinkov also told him
refusal "wouldn't be in [his] best interest."  (Doc. 61-3, Dice Decl. ¶ 3).  Dice "took this as
a threat" since Fisch would make his "life troublesome" in regard to his Lebanon City
properties.  (*Id.*).

   As noted, Harold Dice had given no permission to check the shed for the
number of dogs, leaving that to Dianne Dice, who was responsible for the dogs.  Dianne
Dice initially said they could not go in but eventually agreed that they could if they gave
her a half hour to clean up, as she had just gotten back to the house.  (Doc. 45-10,
Dianne Dice Dep., p. 45).  Dianne Dice and her brother spent forty-five minutes hauling
three or four garbage bags of fecal matter and urine-soaked wood shavings out of the
dog shed.  (Doc. 44, Defs.' SMF ¶ 31; doc. 45-4, Fisch Dep., p. 23).

   Having ostensibly obtained consent to do so, Marinkov and Fisch
investigated the Plaintiffs' property and discovered possible violations of the Township's
ordinances including the open burn pit which was visible from the road.  (Doc. 44, Defs.'
SMF ¶ 28).  The permit for new construction was no longer an issue because the shed
was obviously not new.  After Dianne Dice completed her cleanup of the dog shed,
Marinkov, Fisch and Buhl were permitted access to it.  According to Marinkov and Fisch,
after the cleanup, there was still an overpowering odor of urine and there were dog
dishes crusted with fecal matter.  (Doc 45-4, Marinkov Dep., p. 24; doc. 45-4, Fisch Dep.,
p. 23).  Fisch did note that the new bedding was fresh and that the dogs looked good.
(Doc. 45-4, Fisch Dep., p. 23).

Before Buhl left the Dice property, she asked to see the licenses for all nineteen dogs as well as proof of rabies vaccination. Dianne Dice was unable to produce licenses for some of the dogs and did not satisfy Buhl for at least one of the vaccinations. Buhl cited Dianne Dice for violations of the state dog law. (Doc. 60-3, Dianne Dice Dep., p. 32; doc. 45-4, Fisch Dep., pp. 23-24, 25; doc. 45-3, Marinkov Dep., p. 26).

The Township Ordinance defines a kennel as "any premises, except where accessory to an agricultural use, where (3) or more dogs, ten (10) weeks in age or older, are kept or boarded." (Doc. 44, Defs.' SMF ¶ 33). The Ordinance prohibits a kennel in certain areas of the Township without a special exception or variance. The parties dispute whether the kennel limitation applied to the Dices, but the three-dog limit led to a discussion about reducing the number of dogs on the property to three.

Marinkov and Dianne Dice had a conversation about this but do not agree upon what was said. According to Marinkov, Dianne Dice stated that she would euthanize the dogs for as little as $10 per dog. Marinkov replied that she would buy the dogs from Dice for $15 a dog in order to avoid their euthanization. Dianne Dice then supposedly replied that she would rather eat the dogs then sell them to Marinkov. (Doc. 45-3, Marinkov Dep., pp. 28-29; doc. 45-4 Fisch Dep., p. 24). According to Dianne Dice, when she was told that she had to reduce the number of her dogs to three or less, she stated that she had three options: she could sell the dogs, she could give them away or she could have a veterinarian euthanize them. (Doc. 60-3, Dianne Dice Dep., p. 33).

According to Marinkov, she told Dianne Dice and Andrew Dice that "they may not continue to burn" in the pit, (doc. 45-3 Marinkov Dep., p. 28) that this was "basically . . . an order not to relight the pit." (*Id.*, p. 36). According to Dianne Dice, they were told to "close the pit up." (Doc. 60-14, Dianne Dice Decl. ¶ 10).

As Fisch and Marinkov were leaving the property, Marinkov and Dianne Dice had another exchange of words. According to Marinkov, tensions had eased as the inspection ended, so Marinkov said to Dianne Dice jokingly that she would "kick her butt." (Doc. 45-3, Marinkov Dep., pp. 26-27). Fisch also said the comment was "in jest and everyone was smiling." (Doc. 45-4, Fisch Dep., p. 24). On the other hand, Dianne Dice testified that Marinkov was serious when she "stuck her finger in [Dice's] face" and said "Dianne, I'm older than you, I'm bigger than you, and I will kick your ass if you don't get rid of those dogs quick." (Doc. 60-3, Dianne Dice Dep., p. 36). This "shocked" Dice. Dice "stepped back." She thought Marinkov "was going to hit [her]." (*Id.*). Dianne Dice admits that Marinkov has the right to investigate zoning and code violations, (doc. 45-11, Dianne Dice Dep., pp. 26, 28, 29), but that she brought no charges against her. (Doc. 44, Defs.' SMF ¶ 47).

After the inspection, building code and zoning officers Fisch and Marinkov and State Dog Warden Buhl met with Johnson to describe to him their observations and findings upon their inspection of the Dice property. (*Id.*, ¶ 49). Buhl and Johnson then met with defendant, Greg Setzer, the Humane Society police officer. Setzer knew that Buhl, although then a state dog warden, formerly had been a Humane Society officer, so he was aware that she knew about cruelty laws. (Doc. 6012, Setzer Dep., p. 11). Buhl described the conditions of the dog shed to Setzer and encouraged him to issue citations for violation of the animal cruelty laws. (Doc. 44, Defs.' SMF ¶ 50).

Setzer intended to seize the dogs and filled out search warrants to be executed the next day, June 15. In addition, it was unclear to Setzer, Buhl and Johnson who owned each of the nineteen dogs on the Dice property. They knew that Harold and Audrey Dice owned the property and that the principal caretaker of the dogs appeared to be Dianne Dice. The issue was who was caring for the dogs, but Setzer conducted no

investigation to determine that. (Doc. 60-12, Setzer Dep., p. 6). Even though he had a year to file the charges, he named Harold and Audrey Dice because he was not sure which one of the three Dices owned the dogs, but one of them did, "and we figured the other two would be thrown out which they were." (*Id.*, p. 5). Accordingly, Setzer completed and filed nineteen citations for each of the three Dice plaintiffs, representing a citation for each of the nineteen dogs.        Harold Dice came home later in the afternoon of June 14. Dianne Dice told him about the instructions from Marinkov to clean out the pit and to fill it back up. (Doc. 45-11, Dianne Dice Dep., p. 17). It seemed to Dice that he was going to pay a fine for the pit, so he decided it was cheaper and easier to simply burn what remained in the pit as opposed to hauling it off the property. (Doc. 60-2, Harold Dice Dep., pp. 27, 28).[6] However, he also filled the pit with new material, including brush. (*Id.*, p. 33). Dice reignited the burn pit at around 4:00 or 5:00 p.m. (*Id.*, p. 28).

Harold Dice watched the fire for a period of time that afternoon but went back to the house to get an analgesic because he had a headache. He sat down to eat dinner, and a stranger knocked on the door and said that the dog shed was on fire. Harold Dice went to the dog shed, saw that it was on fire, but could not get into the shed because Dianne Dice had locked the shed door, and she was not on the property at the time. (*Id.*, p. 29).

Local fire and rescue personnel responded quickly to the dog shed fire, but not in time to save the lives of fifteen of the dogs. The local fire and rescue dispatcher contacted defendant Johnson because Johnson was on-call for the Humane Society that night. (Doc. 45-2, Johnson Dep., p. 13). Johnson got the call around 6:50 p.m. and went to the Dice property. (*Id.*).

---

[6]    However, Marinkov never cited Dice for the pit.

13

When Johnson arrived, he was directed to four dogs that had been removed by fire and rescue personnel from the dog shed and which were still alive. Three of the dogs were in dire condition although Johnson attempted to resuscitate at least one of them through mouth-to-mouth resuscitation. (*Id.*, p. 15). A fourth dog was badly burned but was on its feet staggering. (*Id.*). Johnson placed the four surviving dogs in his van and proceeded to take them approximately ten miles to the local veterinary hospital. (*Id.*).

According to Johnson, when they arrived at the hospital, a City of Lebanon police officer who helped him take the dogs out of the van, remarked that "it smell[ed] like gasoline in there [the van]." (*Id.*, p. 41). The police officer said it again when they were before the veterinarian: "those dogs have something on them." (*Id.*). When Johnson went to the hospital on June 15, the next day, three veterinary technicians told him "their office smelled like accelerant." (Id.). When Johnson went to area where the bodies of the dogs were, he smelled it too. (*Id.*).

On June 15, 2007, Johnson talked with local television and newspaper reporters. He testified that he was upset from being up all night, "pretty well burnt out," and in those circumstances, made the comment that in his opinion he thought he smelled "something similar to accelerant" on the four dogs that briefly survived. (*Id.*, pp. 40-41). The Pennsylvania State Police report on the dog-shed fire found "no evidence of a flammable liquid," (doc. 6-11, p. 11), and concluded that the "origin" of the fire was "the ceiling area at the north end of the" shed and was caused by heating and embers from the burning debris in the burn pit getting into the space there through the gable and save vent." (*Id.*, p. 6).

The plaintiffs were mailed the animal-cruelty citations filed by Setzer. (Doc. 60-3, Dianne Dice Dep., p. 70). The charges against Harold and Audrey Dice were

dismissed either before or at the hearing before the magisterial district judge. (*Id.*, p. 71). The charges against Dianne Dice proceeded, and she was found guilty of animal cruelty. (*Id.*). Upon appeal de novo to the Lebanon County Court of Common Pleas, the charges were dismissed. The trial judge commented that the conditions that existed before Dianne Dice cleaned out the dog shed on June 14 were "probably abominable," but what Fisch and the others saw thereafter did not support a guilty verdict. (Doc. 60-8, trial transcript, pp. 64-65).[7]

Defendant, Libby Williams, is a resident of Lebanon, New Jersey, and is the founder of the nonprofit group New Jersey Consumers Against Pet Shop Abuse, a consumer advocacy organization which works to raise public awareness about the connection between puppy mills, pet shops and pet-shop consumer fraud.

Williams set up Google news alerts for news about cruelty to animals. On or about June 15, 2007, she learned of the June 14, 2007, dog-shed fire through news articles that appeared on the internet. The articles included reports that the kennel fire may have been intentionally set. (Doc. 45-6, Williams Dep., p. 10). The articles caused her to remember some information she had been given several years earlier by Joseph O'Neil, a longtime dog seller who lived in Princeton, New Jersey. According to Williams, O'Neil purchased dogs in Pennsylvania and other states and sold them to the public from

---

[7] The trial judge said:

> I will tell you, candidly, my frustration here is that — so Miss Dice understands -- I think the conditions wherein these dogs were kept was probably abominable. My burden of proof here –- and my determination can't be based on a "probably."
> I am not clear why there was leeway given here, to give you a period of time to go in and clean up, cause criminals –- but once that took place, what Mr. Fisch and the others were able to testify to, with regard to what they saw and what they heard, candidly, as a criminal prosecution, I cannot see, rises to a violation of the criminal statute.

(Doc. 60-8, trial transcript, pp. 63-64).

his farm in Princeton.  (*Id.*, p. 9).  O'Neil told Williams that he sometimes purchased dogs from a Harold Dice who, according to O'Neil, lived north of Lancaster, Pennsylvania.  (*Id.*, p. 10).  She thought that the Harold Dice mentioned in the articles was likely the same Harold Dice she had learned about from O'Neil.  (*Id.*, p. 11).

One of the articles was from the June 15, 2007, edition of the *Lebanon Daily News*.  In pertinent part, the article contained the following statements.  "A fire in a Bethel Township kennel killed 18 dogs last night, hours after officials had visited the property to investigate a complaint."  (Doc. 49-2, p. 2, Ex. A, App. of Exhibits to Williams's Br. in Support of S.J.)  The article further reported, quoting Johnson, that "Carl Johnson, investigator for the Lebanon County Humane Society, said he, Buhl and Marinkov "had visited the property" the morning of June 14 "'after receiving an allegation of a puppy mill.'"  (*Id.*).  It also reported, quoting Marinkov, that "during the visit, Marinkov said, Dianne Dice, Harold's daughter, "'threatened to call the vet and put the puppies down.'"  (*Id.*).  It also quoted Marinkov as asking Dice "'[w]hy [she] would do that,?'" and as offering to pay for the puppies on the spot and "'pleading with [Dice] to do the right thing,'" but that Dice "'slammed the door in her face.'"  (*Id.*).  The article further stated that the shed fire was reported seven hours after the investigators had left the property at 1:00 p.m.  (*Id.*)  In the article, Johnson was also quoted as saying, "A high degree of accelerant could be smelled on the dogs and in the shed."  (*Id.*).

Williams sent an e-mail to a friend, a reporter at the *Philadelphia Inquirer*, commenting on the dog-shed fire, as reported in the June 15 *Daily News* article.  In the e-mail, Williams stated with regard to the fire, "How appalling is this? Joe (J.P.) O'Neil, former longtime notorious puppy broker in Princeton, New Jersey told me Harold Dice was one of his puppy suppliers.  O'Neil brokered puppies from Pa. sources for over three

decades until his sudden death two summers ago.  We could never find Dice so we couldn't prove anything.  Now this."  (Doc. 44, SMF ¶ 61).

Her friend forwarded the e-mail to the reporter covering the story at the *Lebanon Daily News*.  Williams was subsequently contacted by the reporter, and on June 16, 2007, an article appeared in the *Lebanon Daily News* under the headline, "Owner's name familiar to activist."  In pertinent part, the article read as follows.

> When she read about the Bethel Township kennel fire, Libby Williams immediately recognized the name of Harold Dice.
>
> Williams is the President and Founder of the New Jersey Consumers Against Pet Shop Abuse, whose website is www.njcapsa.org.
>
> Williams had been alerted to yesterday's *Daily News* story by Amy Worden, a reporter for the *Philadelphia Inquirer*.  In an email to Worden, which Worden forwarded to the *Daily News*, Williams wrote, "How appalling is this? Joe (J.P.) O'Neil, a former longtime notorious puppy broker in Princeton, New Jersey told me Harold Dice was one of his puppy suppliers.  O'Neil brokered puppies from Pa. sources for over three decades until his sudden death two summers ago.  We could never find Dice so we couldn't prove anything.  Now this."
>
> . . . .
>
> Williams was appalled by Thursday's fire.  "It's just so sad what happened there," Williams said.

(Doc. 49-2, p. 5, Ex. B of Appendix).[8]

---

[8] Williams was also interviewed for the article and she made the following additional remarks, as reported in the article:

> When contacted by the *Daily News* yesterday afternoon, Williams said she had "never received as many comments about a story in such a short period of time."
>
> O'Neill made his comments about Dice "years ago," Williams said.
>
> Williams said O'Neill "was hated by people from the East Coast to the Midwest.  He sold mixed-breed dogs for $600." . . .
>
> O'Neil "sometimes had 150 dogs in a week" Williams said. "He told me, 'I get a lot of them from Harold Dice,' who he said lived

According to Williams, Joseph O'Neil was licensed in Pennsylvania as an out-of-state dog dealer and operated a licensed kennel in New Jersey. (Doc. 45-6, Williams Dep., p 9). She said she met O'Neil in 2003 when the New Jersey Division of Consumer Affairs received a complaint concerning him, (*id.*), and that this complaint was fully resolved. (*Id.*). Williams struck up a relationship with O'Neil because, according to her, O'Neill felt he complied with New Jersey and Pennsylvania law, and wanted to provide her with information about unlicensed dealers and breeders in the hope that she would turn them in to the proper authorities. (*Id.*). At her deposition, Williams said she had no opinion whether Harold Dice was involved in breeding or selling dogs. (*Id.*, p. 14). For his part, Dice denied ever knowing or meeting O'Neill. (Doc. 60-2, p. 54).

On June 22, 2007, approximately one week after the kennel fire, the Dice's home was severely damaged by fire. (Doc. 44, Defs.' SMF ¶ 66). Harold Dice believes his home was burned by animal rights activists who read newspaper articles that appeared after the kennel fire in which Carl Johnson and/or Libby Williams were quoted, (doc. 44, Defs.' SMF ¶ 69), but Dice has no proof of this, (doc. 60-2, Harold Dice Dep., p. 59), and he admits that no one has taken responsibility for the burning of his home. (Doc. 44, Defs.' SMF ¶ 70). The police who investigated the house fire have never indicated to Harold Dice who they believe was responsible for the fire nor have they indicated it was animal rights activists. (Doc. 60-2, Harold Dice Dep., p. 59). The Pennsylvania State Police report concluded that arson could "not [be] ruled out" as a cause of the house fire. (Doc. 60-11, p. 16).

---

somewhere north of Lancaster County."

(*Id.*). These remarks are not part of the defamation claim. The amended complaint bases the defamation claim only on the e-mail (doc. 21, Am. Compl. ¶ 34(b)), and alleges that the false statement was that Harold Dice "engaged in the sale of puppies." (*Id.* ¶ 34, page 10). As noted in Williams's reply brief, the e-mail only charges that Harold Dice was one of O'Neil's "puppy suppliers."

Harold Dice believes that Williams's alleged defamation damaged him by causing him to lose his home and outbuildings. (Doc. 49-2, Ex. C, App. to Williams's Br. in Support of S.J. ). He has been unable to specify any damage to his rental business, dairy farm or car dealership. (Doc. 60-2, Harold Dice Dep., pp. 55-56). He has testified that Johnson's statement caused him emotional distress, (doc. 60-2, Harold Dice Dep., pp. 55-56), and damaged his reputation. (Doc. 61-3, Harold Dice Decl., pp. 4-5).

IV.    *Discussion*

   A.    *The Record Fails to Establish that*
         *Defendants Fisch or Marinkov Conspired*
         *to Violate Any of the Plaintiffs' Federal*
         *or State Rights*

All three plaintiffs have alleged that defendants Fisch, Johnson, Marinkov and Setzer conspired on the federal civil rights claims. The plaintiffs have also asserted a state-law civil conspiracy claim against these defendants. Fisch and Marinkov argue that there is no evidence they conspired with anyone and hence any claim against them, either federal or state, fails to the extent it has to rely on allegations of concerted action on their parts.[9]

The plaintiffs' federal rights are enforceable against the defendants by way of 42 U.S.C. § 1983. To state a section 1983 claim, a plaintiff must plead two essential elements: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right. *Miller V. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010). To make a conspiracy claim

---

[9] Johnson and Setzer also argue against the conspiracy claims but base their argument on a lack of evidence of a substantive constitutional or state-law violation rather than a failure to show agreement to engage in a conspiracy. Of course, Fisch and Marinkov also argue they committed no substantive violations, but we deal here with their separate argument that there is no evidence they conspired with anyone to commit an unlawful act.

under section 1983 a plaintiff must additionally establish the elements of a civil conspiracy. *Ammlung v. City of Chester*, 494 F.2d 811, 814 (3d Cir. 1974)(relying on Pennsylvania civil conspiracy law to set forth the elements). "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Adams v. Teamsters Local 115*, 214 F. App'x 167, 172 (3d Cir. 2007)(nonprecedential)(quoting in part *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979)(quoted case and internal quotation marks omitted). "The agreement can be shown by direct or circumstantial evidence," *Id.*; *see also Marulli v. Alloy*, Nos. 04-2869 and 04-2874, 2006 WL 2772553, at *8 (D.N.J. Sept. 23, 2006). But plaintiffs cannot base their claim "solely on suspicion and speculation." *Marulli*, 2006 WL 2772553, at *8.

Fisch argues that any federal civil-rights conspiracy claim against him fails because the plaintiffs have no evidence to show that he agreed with another defendant to violate their federal rights. In support, he relies on the evidence showing that until he was on the way to the Dice property the morning of the inspection, he was unaware that he was going to inspect a property owned by the Dices. Additionally, he only went to the property because he was ordered to do so by his superior Chris Miller.[10] Miller in turn had acted in response to a request from Bethel Township. Further, Fisch had no part in the filing of the animal-cruelty citations against the plaintiffs, as the record shows that Setzer only spoke to Johnson and Buhl about that.

Marinkov argues in a similar fashion. She points to how it happened that she and Fisch did the inspection. Marinkov simply responded to a communication from

---

[10] As noted earlier, Fisch happened to be working as a code-enforcement officer on June 14 because it was his day off from his regular job.

Johnson about potential code violations. Additionally, neither she nor Johnson chose Fisch and in fact, as Fisch has noted, his supervisor Miller told him to assist Marinkov. Further, Marinkov viewed the burn pit before she decided to visit the Dice property, a further indication that Marinkov was simply doing her job as a Bethel Township code-enforcement officer, not participating in a conspiracy to violate the plaintiffs' rights because for some unknown motive she wanted to assist Johnson in doing so.[11]

These defendants also argue that the state-law civil conspiracy claim fails. Under Pennsylvania law, "[t]he essential elements of a claim for civil conspiracy are as follows: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage." *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008). "The mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy." *Id.* (quoted case omitted). "In addition, 'absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.'" *Id.* (quoted case omitted).[12]

Fisch argues that Plaintiffs fail to establish a claim for state-law civil conspiracy against him because there is no evidence that he agreed with any other named defendant to do an unlawful act or to do a lawful act by unlawful means. To the contrary, and as argued above, Fisch was merely performing his job duties by assisting Marinkov with the inspection of Plaintiffs' properties. By the same token, there is no

---

[11] The plaintiffs are claiming that the conspiracy started when Johnson decided to retaliate against Harold Dice because in January 2007 Dice had told him to stay off his property.

[12] The elements are the same as a section 1983 conspiracy claim because the Third Circuit borrows Pennsylvania law on civil conspiracy for the elements of a section 1983 conspiracy.

evidence that Fisch was motivated by malice or caused any legal damages to the Plaintiffs. Fisch notes that no citations for code violations were issued to the Plaintiffs. As for Marinkov, she argues there were violations of the local code, the three-dog limit for kennels, and the burn pit. Marinkov says that they met after the inspection with Johnson only because Johnson had a legitimate interest in what the inspection revealed.

We agree with Fisch and Marinkov that they did not conspire with anyone, either on the federal or state-law claim, because there is no evidence they acted in concert with anyone to do an unlawful act, a requirement of both the federal and state-law claims.

In opposition to this conclusion, Plaintiff argues that there is a fair inference that all the defendants had knowledge of the unlawful purpose from the following: (1) Fisch knew about Johnson through his dealings with Dice on Dice's Lebanon City properties and more specifically about the landlord/tenant issues between the two; (2) Setzer was Johnson's co-worker; (3) "Marinkov had knowledge through the various municipalities' labor exchange polices (sic) with Fisch . . . ." (Doc. 59, p. 22, The plaintiffs.' Opp'n Br.).

We disagree. We do not believe that the first two facts indicate that Fisch or Marinkov knew of an unlawful purpose.[13] In the amended complaint, the plaintiffs' theory is that Johnson wanted to retaliate against Harold Dice because Dice had told him in January 2007 to stay off his property. Assuming for the sake of argument that this was Johnson's motive, none of the evidence indicates that Fisch or Marinkov would have had any motivation to assist him by joining in the commission of a civil rights violation. It is true that Marinkov went out to the property with Johnson the day before the inspection,

---

[13] The third assertion is unsupported by any evidence and appears to be an incomplete thought.

and even went there because Johnson contacted her, but she *was* the Township code-enforcement officer, and she *did see* potential violations. Just because they went together means nothing by itself. "The mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy." *Phillips*, *supra*, 959 A.2d at 437. As for Fisch, he was friendly with Dice, not Johnson, so the evidence would show, if anything, that he would have sided with Dice, not Johnson.

    B.    *Harold Dice Has No Defamation or False Light*
                *Claim Against Williams But Does Have Such*
                *Claims Against Johnson*

Defamation is an injury to a person's reputation, character or fame. *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. 2008). "A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession." *Id.* (cited case omitted). Stated another way, a communication is defamatory if it "tend[s] to lower a person in the estimation of the community, deter[s] third persons from associating with him, or adversely affect[s] his fitness for the proper conduct of his lawful business or profession." *Id.* (cited case omitted). The statement must be untrue, *id.* (citing 42 Pa. Con. St. Ann. § 8343(a)), and must be examined in context to determine if it is defamatory. *Id.* We deal here with a libel since a libel is a written defamation, *id.*, and the plaintiff bases his defamation claim on an e-mail, a written communication.

In regard to the false light claim, such a claim protects against "'publicity that unreasonably places the other in a false light before the public.'" *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. 1997)(quoted case omitted). It requires "such a major misrepresentation of [the plaintiff's] character, history, activities or beliefs that a reasonable person in the plaintiff's position would take "serious offense" at the

false impression created. *Id.* "The elements to be proven are publicity, given to private facts, which would be highly offensive to a reasonable person and which are not of legitimate concern to the public." *Id.* A defendant may rely on accurate facts, but if he creates an overall impression of falsehood, the plaintiff has a claim. *Lansaw v. Zokaites (In re Lansaw)*, 424 B.R. 193, 198 (W.D. Pa. Bank. 2010).

Williams argues that neither claim is valid. On the defamation claim, she argues that it fails because her e-mail was not defamatory; it merely said that Harold Dice had sold puppies to puppy broker O'Neill. Defendant argues that this statement could not have damaged Dice's reputation, exposed him to public hatred, contempt, or ridicule, or injured him in his business or profession as selling puppies to a licensed broker is a legal activity. Further, since O'Neill's business was legitimate, any asserted relationship with O'Neill could not have damaged Dice's reputation. As additional support that her e-mail was not defamatory, Williams points to the plaintiffs' deposition testimony indicating that negative contact the Dices had with members of the public was about the kennel fire and the way the dogs died, not about them selling puppies. In opposition, plaintiff Harold Dice argues, in pertinent part, that Williams did defame him because her remarks in effect charged him with running a puppy mill.[14]

"'It is the function of the court to determine whether the challenged publication is capable of a defamatory meaning. If the court determines that the

---

[14] Plaintiff also argues that Williams falsely charged him with having "had a hand in causing the fire and even the death of J.P. O'Neill." (Doc. 59, Opp'n Br. at pp. 44-45). As noted, the defamation claim is based on the e-mail, which says nothing about the fire or the death of O'Neill. In any event, there is absolutely no evidence that Williams ever said that Harold Dice played a part in O'Neill's death. In fact, any evidence is to the contrary. In her remarks to the reporter published in the June 16, 2007, article, Williams said O'Neill died suddenly on a trip to Hungary. As noted above, in opposing summary judgment, the nonmoving party cannot simply rely on allegations he puts in his brief. Instead, he must produce evidence. There is also no evidence, as the plaintiffs charge in their brief, that Williams "repeatedly defamed Plaintiff Harold Dice and his family by making false and defamatory statements in the newspapers, internet cites and on Williams' own website . . . ." (*Id.*, p. 44).

challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial.'" *Tucker v. Philadelphia Daily News*, 577 Pa. 598, 614-15, 848 A.2d 113, 123-24 (2004)(quoting *Thomas Merton Center v. Rockwell Int'l Corp.*, 497 Pa. 460, 464-65, 442 A.2d 213, 215-16 (1981)). The plaintiff has the burden of proving that a statement is defamatory. *Id.* at 614, 848 A.2d at 123; 42 Pa. Con. St. Ann § 8342(a)(1).

We disagree with Plaintiff that the e-mail remarks are capable of a defamatory meaning. We take them in context, which means we examine them in light of the June 15, 2007, article reporting on the fire and that nineteen dogs were found on the property during the inspection, prompted by what Johnson stated was an allegation of a puppy mill. Even against this backdrop, the remarks are not defamatory. They do not refer to any conditions in the dog shed or to a quantity of dogs, only that Dice supplied puppies to O'Neill. The remarks describe O'Neill as a "notorious puppy broker," but being a "puppy broker" has no negative connotation in the mind of the average newspaper reader. *See Walker v. Grand Central Sanitation, Inc.*, 430 Pa. Super. 236, 243, 634 A.2d 237, 240 (1993)(the defamatory meaning takes into account the effect of the statement on "the minds of average persons among whom it is intended to circulate"). And being a *notorious* puppy broker reflects only on O'Neill, not Harold Dice.[15]

Defendant next argues that Plaintiff has failed to assert a false light claim against her because her statement that he supplied puppies to O'Neill is not such a major misrepresentation of the plaintiff's activities that a reasonable person in the plaintiff's position would take serious offense at any false impression created. We agree. We think

---

[15]  Citing 42 Pa. Con. St. Ann. § 8343(a)(6), Defendant has also argued that Plaintiff has shown no special harm from her statement. We need not reach this issue as we have already concluded that Williams's statement is not capable of a defamatory meaning. In any event, section 8343(a) is intended to impose on a plaintiff in a defamation action the burden of proof on certain issues, one of which is "special harm," as noted in subsection (a)(6). But as the statutory section makes clear, the plaintiff has the burden of proving special harm only "when the issue is properly raised." In a libel action, it is not necessary for a plaintiff to prove special harm; actual damages are sufficient. *Joseph*, *supra*, 959 A.2d at 344.

it is obvious that being placed in the false light of being a puppy supplier or puppy seller would not be highly offensive to a reasonable person.

We will therefore grant defendant Williams summary judgment on both claims against her. We turn now to the defamation and false light claims against defendant Johnson.

Harold Dice's defamation claim against Johnson is that Johnson falsely told the news media on June 15, 2007, that Dice had set fire to the shed and the dogs. In moving for summary judgment on the claim, Johnson makes three arguments.

Johnson's first argument is that Dice suffered no damages from Johnson's remarks because Dice has presented no evidence of any "actual or special harm" to his reputation. As Williams did, Johnson relies on 42 Pa. Con. Stat. Ann. § 8343(a)(6) and uses this section to assert that "[s]pecial harm to the plaintiff from [the] publication," *id.*, is an element of a defamation action.

We reject this argument. We begin by noting that Johnson does not contest that his statement was defamatory. Indeed, he cannot contest it, as it clearly constitutes slander per se.[16] Putting aside that the statement accused the Dices of arson, Johnson also implied that they had set fire to the dogs. Under 18 Pa. Con. St. Ann. § 5511(a)(2.1)(i)(A), this is a crime punishable by imprisonment.[17] A false accusation of that type of crime is slander per se. *Brinich v. Jencka*, 757 A.2d 388, 397 (Pa. Super. 2000).

Since the defamation was slander per se, Johnson's first argument fails. Johnson says Dice has presented no evidence of an essential element of a defamation

---

[16] Slander is an oral defamation. *Rossi v. Schlarbaum*, 600 F. Supp. 2d 650, 662 (E.D. Pa. 2009)*.*

[17] Section 5511(a)(2.1)(i)(A) makes it a misdemeanor of the first degree for a person to "[k]ill[ ], maim[ ], mutilate[ ], torture[ ] or disfigure[ ] any dog or cat, whether belonging to himself or otherwise . . . ."

claim, "actual or special harm" to his reputation, and cites in support section 8343(a)(6)'s requirement that a plaintiff has the burden of proving "special harm . . . from [the] publication." However, as we noted in dealing with Williams's summary judgment motion, section 8343(a) merely assigns the burden proof on certain issues in a defamation claim to the plaintiff, among them the burden of showing "special harm" "when the issue is properly raised." In a slander per se action, it is not necessary for a plaintiff to prove special harm; "actual harm" is sufficient. *Brinich*, *supra*, 757 A.2d at 397. "Actual harm includes 'impairment of reputation and standing in the community, . . . personal humiliation, and mental anguish and suffering.'" *Id.* (quoted authorities omitted). Plaintiff Dice has presented evidence of actual harm as he has testified that Johnson's statement caused him emotional distress, (doc. 60-3, pp. 55-56), and damage to his reputation. (Doc. 61-3, pp. 4-5).[18] Additionally, in any event, section 8343(a)(6) does not refer to "actual" harm, so it has no bearing on recovery of actual damages.[19]

We deal with Johnson's second and third arguments together. Johnson's second argument is that he had a qualified privilege to make the statement in part because he made it in good faith, without actual malice, and with reasonable grounds for

---

[18] In contrast to "actual harm," "special harm" or "special damages" are "out-of-pocket expenses," *Joseph*, *supra*, 959 A.2d at 344, what *Brinich* called "pecuniary loss," 757 A.2d at 397. In *Joseph*, the Pennsylvania Superior Court said that "actual damages" included "general damages" (injury to reputation and personal humiliation) and "special damages." 959 A.2d at 344.

[19] On the issue of damages, the plaintiffs assert that they should be able to recover for the loss of the farmhouse as part of their defamation claim against Johnson. They reason that a jury could conclude that Johnson's remarks, in combination with Williams's alleged suggestion on the web that the Dices be burned alive, led an animal rights activist to burn down the farmhouse and, if so, Johnson's remarks would be a "proximate cause" of the loss. Doc. 59, p. 46). We disagree. We also note, and we cannot emphasize this enough, there is absolutely no evidence for the outrageous statement that Williams suggested the Dices be burned alive, nor have the plaintiffs provided any evidence for their assertion in their counter-statement of material facts (doc. 60 ¶ 57) that other people stated that the Dices and their home should be burned to the ground. The plaintiffs rely on an exhibit, doc. 61, p. 5, Ex. 10, that does not support the allegation. Additionally, we note that Dice cannot recover for other business losses as he presented no proof of ascertainable losses to his other business interests.

27

believing it to be true. In support of the reasonableness of his belief, he relies on the following. First, a Lebanon City police officer and three veterinary technicians had commented the evening of the fire about the dogs and a chemical odor. Second, he was "understandably weary and upset the morning after the fire." (Doc. 51, Supp'n Br. at p. 24). Third, he was aware of Dianne Dice's comments the day before about putting down the dogs. As final support for a privilege to make the statement, Johnson asserts he had an interest as a Humane Society employee to report on his investigation to the news media, citing *McCormick v. Specter*, 220 Pa. Super. 19, 275 A.2d 688 (1971).

Johnson's third argument is that he is not liable because defamation requires negligence, *see Am. Future Sys., Inc. v. BBB of Eastern Pennsylvania*, 592 Pa. 66, 84, 923 A.2d 389, 400 (2007), and he was not negligent in making the statement. In pursuing this argument, Johnson once again asserts he had reasonable grounds to believe that the statement was true, relying on the following. At the time, he was understandably emotionally distraught. As part of the rescue effort, he had helped carry from the dog shed fifteen dogs which had suffered greatly from the fire. Additionally, in his view, Dianne Dice did not particularly care for the dogs and kept them in deplorable conditions. And despite being warned by inspectors about the danger of lighting the burn pit due to its proximity to the dog shed, the Dices proceeded to light it anyway. When asked to reduce the number of dogs to comply with zoning regulations, Dianne Dice mentioned the possibility of having them put down. Further, as noted above, the evening before the statement, a police officer and three veterinary technicians said that they smelled a strange chemical odor on the animals. Johnson asserts that, given these circumstances, it was not unreasonable for him to offer his honest opinion that "he thought" (as his brief puts it) he smelled accelerant on the dogs. Hence he was not negligent in making the statement and cannot be liable for defamation.

We can treat both of these arguments together because if there is negligence, it defeats the defense of privilege at the same time it defeats Johnson's argument for why there is no defamation claim.[20]  A plaintiff can defeat a privilege defense by showing that the statement was negligently made.  *Smith v. Borough of Dunmore*, No. 05-1343, 2007 WL 762930, at *10, 11 (M.D. Pa. Mar. 7, 2007)("A qualified privilege may be destroyed by a libel defendant's failure to exercise reasonable diligence to ascertain the truth before giving currency to an untrue communication.").  A showing of negligence also means that this element of a defamation claim (the element that the statement had to have been negligently made) has been satisfied.

Negligence can be established by a failure to conduct an investigation.  *Rue v. K-Mart Corp.*, 456 Pa. Super. 641, 663-64, 691 A.2d 498, 509 (1997)(examining negligence in the context of a claim of privilege), *aff'd*, 552 Pa. 13, 713 A.2d 82 (1998); *Smith*, *supra*, 2007 WL 762930, at *11.  Here, it appears that Johnson conducted no investigation nor did he wait for an investigation before making his remarks.[21]  In part, he asserts his statement was justified because a police officer and three veterinary technicians said that they smelled a strange chemical odor on the animals, but he produces no evidence from these witnesses.  He also attempts to justify the statement by his emotional and physical condition after the fire and the death of the dogs, but this has no bearing on whether he was negligent.  We conclude that a reasonable jury could find that he was negligent and therefore will allow the defamation claim to proceed.

---

[20] In fact, for this reason the Pennsylvania Supreme Court considers a conditional privilege no longer relevant to a Pennsylvania defamation claim when the privilege can be defeated by showing the defendant was negligent.  *See Am. Future Sys., Inc.*, *supra*, 592 Pa. at 80-81, 923 A.2d at 398; *Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009) (nonprecedential).

[21] In fact, a state police investigation found no evidence of a flammable liquid on the dogs.

Johnson also moves for summary judgment on the false light claim by advancing the same reasons why he was supposedly not negligent in making the statement. On this claim, he maintains his argument is stronger because on a false light claim a plaintiff cannot rely on negligence but must meet a higher standard, that the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa. Super. 66, 81, 543 A.2d 1181, 1188 (1988); *see also Lansaw*, *supra*, 2010 WL 668666, at *3. We reject this argument because Johnson's failure to investigate, or await an investigation, would also support a finding that Johnson had acted recklessly. We will therefore deny Johnson's motion for summary judgment on the false light claim.

  C. *Dianne Dice Has No Federal or State-Law*
    *Excessive Force Claim Against Marinkov*

Defendant Marinkov moves for summary judgment on the two excessive force claims Dianne Dice has made against her, one under the Fourth Amendment and the other under state law. Dice bases these claims on the exchange she had with Marinkov at the end of the inspection. According to Dice, Marinkov stuck her finger in Dice's face and told her she would "kick [her] ass" if she did not get rid of the dogs quickly. Dice even stepped back, thinking Marinkov was going to hit her.[22]

Marinkov argues the Fourth Amendment excessive force claim fails because such a claim requires the seizure or arrest of the plaintiff, and the record shows that no seizure or arrest of Dianne Dice occurred. We agree. *See Smith v. Dep't of Gen. Serv.*, 181 F. App'x 327, 330 (3d Cir. 2006) (nonprecedential) (finding no Fourth

---

[22] According to Marinkov, tensions had eased as the inspection ended, and she had only jokingly told Dice she would "kick her butt."

Amendment claim when the plaintiff was not detained or arrested).  We acknowledge the plaintiff's argument to the contrary, but we reject it.[23]

Marinkov also argue that the state-law excessive force claim fails because such a claim requires that the defendant put the plaintiff in reasonable apprehension of an imminent battery.  Dice's evidence does not show this, only that Marinkov wagged her finger in her face and made a threat to commit an act at some later time, conditioned on whether Dice had removed the dogs from the property.

We agree with Marinkov that the state-law excessive force claim also fails.

> In Pennsylvania, 'an assault may be described as *an act* intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery.'" *Cucinotti v. Ortmann,* 399 Pa. 26, 159 A.2d 216, 217 (1960) (italics in original).  "Words in themselves, no matter how threatening, do not constitute an assault; the actor must be in a position to carry out the threat immediately, and he must take some affirmative action to do so." *Id.*  In other words, "[t]hreatening words alone are deemed insufficient in this jurisdiction to put a person in reasonable apprehension of physical injury or offensive touching." *Id.* at 218.

*Regan v. Upper Darby Twp.*, 2010 WL 178263, at *3 (3d Cir. 2010) (nonprecedential). We acknowledge that Dianne Dice thought she was going to be hit, but it is the defendant's conduct we must examine, and since Dice could not have been put in reasonable apprehension of an immediate battery by a conditional threat, which depended upon whether the dogs were removed, there was no state-law assault here. *See Gen. Mach. Corp. v. Feldman*, 352 Pa. Super. 180, 184-85, 507 A.2d 831, 833-34 (1986)(lawyer's alleged threat "to inflict bodily harm upon any person who attempted to recover . . . documents from him" was not an assault because the threat "was conditional and did not reflect a present purpose to do harm").

---

[23]  Nor do the circumstance give rise to a substantive due process claim, which requires that the defendant's conduct be conscience shocking.  *Id.* at 330-31.

### D. Federal and State-Law Malicious Prosecution Claims

All three plaintiffs have made federal and state-law malicious prosecution claims against Johnson, Setzer, Marinkov and Fisch based on the citations the Dices were issued for animal cruelty. "To prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007). The elements are the same for a state-law malicious prosecution action except that a plaintiff need not show a deprivation of liberty. *Kossler v. Crisanti*, 564 F.3d 181, 186 n.2 (3d Cir. 2009)(en banc).

Fisch and Marinkov both make the same argument against these claims, that the evidence shows that neither of them initiated the criminal proceedings against the Dices nor participated in that decision. Hence the plaintiffs fail to satisfy one of the elements of the claim, that they initiated the criminal proceedings. We agree. The record shows that Fisch, Marinkov and Buhl met with Johnson after their inspection of the property to describe to him their observations and findings, but that it was Buhl and Johnson who then met with Setzer to discuss filing charges. Buhl described the conditions of the dog shed to Setzer and encouraged him to issue the citations for animal cruelty. Setzer was influenced by Buhl, whom he knew had formerly been a Humane Society officer, although at that time she was the state dog warden. We will therefore

grant Fisch and Marinkov summary judgment on the federal and state-law malicious prosecution claims.

Johnson and Setzer argue that the federal claim fails for several reasons, but we need only address one of them, the argument that the plaintiffs did not suffer a deprivation of liberty. Johnson and Setzer point out that none of the Dices were arrested; the prosecution was initiated by sending them citations in the mail. They did have to appear before a magisterial district judge to contest the charges (where Dianne Dice was found guilty and the charges were dismissed against Audrey and Harold Dice). Dianne Dice also had to appear in the court of common pleas for her appeal de novo, where she was acquitted. But trial attendance is not a deprivation of liberty for the purpose of a Fourth Amendment malicious prosecution claim. *See Mann v. Brenner*, 2010 WL 1220963, at *3 (3d Cir. 2010) (nonprecedential) (citing *DiBella v. Borough of Beachwood,* 407 F.3d 599, 603 (3d Cir. 2005)). We agree and will grant Johnson and Setzer summary judgment on the federal malicious prosecution claim.[24]

Johnson and Setzer also argue that the state-law malicious prosecution claim fails against them as well. First, Johnson may not be held liable because he did not institute the criminal proceedings. Second, Setzer had ample probable cause to prosecute the Dices because Diane Buhl, Jerry Fisch and Brenda Marinkov reported to Johnson about the deplorable conditions in the dog shed. In turn, Johnson and Buhl reported these firsthand observations to Setzer. Reliance by Setzer on Buhl's observations was justified because she was a dog warden and formerly a Humane Society police officer. Third, there simply is no evidence of malice. The impetus for the investigation was a complaint provided by the Dices' neighbor, Natasha Kale, to Johnson;

---

[24] This argument is an additional one supporting summary judgment in favor of Fisch and Marinkov on the federal malicious prosecution claim.

in addition, the open burn pit and multiple barking dogs were observable, and were observed, from the road by Marinkov and Fisch.

After review of the parties' arguments, we conclude that the state-law malicious prosecution claim by Harold and Audrey Dice can proceed against Setzer, but that Dianne Dice's claim fails because there was probable cause for the animal-cruelty charges against her.

We will grant Johnson summary judgment on this claim because the record shows that Setzer made the decision to initiate the proceedings against the Dices after taking into consideration Buhl's report on the conditions in the dog shed. Since Johnson did not initiate the proceedings, the claim fails to satisfy one of the elements of a malicious prosecution claim, and it cannot proceed against him.

As to Setzer, we must allow the claim to proceed because he conducted no investigation to determine which Dice was caring for the dogs. Instead, he named all three Dices, even though he was not sure which of them owned the dogs, figuring that citations against the wrong parties would be thrown out. Under these facts, we cannot agree there was probable cause to charge Harold and Audrey Dice. Since Setzer filed the charges not knowing if they were liable or not, it follows that these two plaintiffs may be able to prove malice, another element of the state-law claim. "Malice" for the purpose of a state-law claim of malicious prosecution means more than the ordinary understanding of the word as indicating "hatred or ill will"; it also includes a "defendant's reckless . . . disregard of plaintiff's rights." *Hugee v. Pennsylvania R. Co.*, 376 Pa. 286, 291, 101 A.2d 740, 743 (1954). It is in the latter sense of the word that Setzer may have

exhibited "malice" -- by his failure to ascertain who owned or cared for the dogs before citing all three plaintiffs -- not by any ill-will toward the Dices.[25]

However, Dianne Dice's state-law claim as to Setzer fails because there was probable cause as against her. The charge of animal cruelty, 18 Pa. Con. St. § 5511©, encompasses neglect of clean and sanitary shelter for animals in a person's care. Diane Buhl, who reported to Setzer on the conditions she saw in the dog shed, would have provided sufficient probable cause to file against Dice. *See Strickland v. Univ. of Scranton*, 700 A.2d 979, 984 (Pa. Super. 1997)("Probable cause in the context of the tort of malicious prosecution does not require proof beyond a reasonable doubt, but rather, is defined as 'a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that a party is guilty of the offense.'")(quoted case omitted).

    E.   *Audrey Dice's and Dianne Dice's*
        *Retaliation Claims Based on Familial*
        *Association with Harold Dice*

Audrey and Dianne Dice have made claims that the defendants except Williams retaliated against them because of their familial association with Harold Dice. The plaintiffs' opposition brief makes clear that the basis of this claim is that the defendants interfered with the family relationship by the inspection of the property, the issuance of the citations and the alleged defamation. (Doc. 59, p. 31). The right of intimate association is protected by the Constitution, *see Schlarp v. Dern*, 610 F. Supp. 2d 450, 461-62 (W.D. Pa. 2009), but here none of the defendants' conduct interfered with the family relationship. Hence these claims fail.

---

[25] There is certainly no evidence that Setzer was feeling hostile toward Harold and Audrey Dice, or had ill will against them, the commonplace understanding of "malice."

F.   *Dianne Dice Has No Due Process Claim*
     *Against Defendant Fisch for Refusing to*
     *Return Her Dogs*

In Count III of the Amended Complaint, Dianne Dice makes a Fourteenth Amendment claim alleging that following the fire at the dog shed, the defendants refused to return one of dogs to her.  (Am. Compl. 39).  Fisch asserts he cannot be liable on this claim because Dice has acknowledged that Fisch had no involvement with it.  (Doc. 45-11, Dianne Dice Dep., p. 22).  We agree.  Dianne Dice admitted at her deposition that Fisch did not have possession of any of her dogs after June 14, 2007.  He therefore cannot have violated any of her due process rights in failing to return any of her dogs.

G.   *The Fourth Amendment Claim for the Search*
     *of the Property, Including the Dog Shed*

The plaintiffs have made a claim that the June 14, 2007, inspection of the property violated the Fourth Amendment because it was obtained by coercing Harold Dice to consent to the inspection.

> It is well established that police officers may constitutionally conduct a search without a warrant or probable cause based upon an individual's voluntary consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  Voluntariness "is a question of fact to be determined from the totality of all the circumstances."  *Id.* at 227.  Evidence that the consent was induced by police coercion renders the consent invalid.  *Id.*  We have held that "the critical factors comprising a totality of the circumstances inquiry . . . include[ ] the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]."  *Givan*, 320 F.3d [452, 459 (3d Cir. 2003).]

*United States v. Coppedge*, 2010 WL 827298, at *2 (3d Cir. 2010) (nonprecedential).  *See also United States v. Griesbaum*, 185 F. App'x 186, 191 (3d Cir. 2006)(nonprecedential).  These principles apply to the legality of the search that Fisch and Marinkov conducted on June 14, 2007.

Based on the foregoing principles, the defendants essentially make the following points in moving for summary judgment on the Fourth Amendment search claim. Harold Dice is a 67-year-old business man who owns numerous rental properties. He also had had a working relationship with Fisch over code-enforcement issues in the City of Lebanon for more than ten years, and the two developed a friendship and a mutual respect. Given this background, Dice would not have been intimidated by Fisch into giving his consent. Further, his consent was given over the phone, in daylight hours, and certainly not in a custodial setting. That he was not coerced was also evident from his advice to his daughter that a search of the property would be alright.

As to Dianne Dice and the search of the dog shed, her consent was voluntary as well. She was sophisticated enough in the 1990s to have operated a kennel with over sixty dogs, bred for sale. The record shows she agreed to the search, and in fact she imposed a condition upon it, that she be allowed to clean out the dog shed before Fisch, Marinkov and Buhl could go inside. Dianne Dice spent about thirty to forty-five minutes cleaning out the shed before the inspection began. Under these circumstances, her consent was not coerced either.

We will deny summary judgment. Harold Dice testified that Fisch and Marinkov repeatedly called him, threatening that they could get a warrant in any event, and that if they forced him to get a warrant, he will have wished that he had not done so. In a supplemental declaration, Dice adds that Fisch and Marinkov also made a more broad threat, telling him refusal "wouldn't be in [his] best interest." We conclude that the issue of consent is best left to the fact finder. However, we will enter judgment in favor of Johnson and Setzer on this claim, as they correctly assert that they cannot be liable because they were not present for the search and did not take part in the discussions with Harold Dice about obtaining his consent. *See Evancho v. Fisher*, 423 F.3d 347, 353

(3d Cir. 2005)(personal involvement in the alleged wrongs is necessary for the imposition of liability in a civil rights action).[26]

      H.    *The First Amendment Retaliation Claim Based on Harold Dice's Exclusion of Johnson From the Property*

Harold Dice makes a First Amendment claim against Fisch Marinkov, Johnson and Setzer that the June 14, 2007, inspection was in retaliation for his telling Johnson to stay off the property when Johnson came to investigate the condition of some Great Danes in or about January 2007. Plaintiff maintains that the search was in retaliation for his expressive conduct in telling Johnson to stay off the property.[27]

To assert a constitutional claim for retaliation, a plaintiff must prove "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Miller, supra,* 598 F.3d at 147 (quoted case omitted). The second element has sometimes been called an "adverse action" and the third element has sometimes been phrased as a requirement of showing "a causal link between the exercise of [the] constitutional right[ ] and the adverse action taken." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

All four defendants argue that this claim fails because Dice's conduct in telling Johnson to stay off the property is not activity protected by the First Amendment, and hence Dice has not satisfied the first element of a retaliation claim. We agree. *See Dotzel v. Ashbridge*, 306 F. App'x 798, 802 (3d Cir. 2009) (nonprecedential)("The First Amendment protects only the right to associate for the purpose of engaging in activities

---

[26] Nor can Johnson and Setzer be liable on a conspiracy theory as we have concluded that Fisch and Marinkov did not conspire with anyone.

[27] In his opposition brief, Plaintiff also relies on his lawsuit against Johnson for unpaid rent, his business activities in the City of Lebanon, and his and Dianne's initial refusal to allow the search as protected First Amendment activities. (Doc. 59, p. 29). These were not part of the claim in the amended complaint and will not be considered.

protected by the First Amendment-speech, assembly, the right to petition, and free exercise of religion.").

V.    *Conclusion*

Based on the foregoing, the following claims will proceed: (1) the defamation and false light claims against Johnson; (2) the state-law malicious prosecution claim against Setzer; (3) the due-process claim by Dianne Dice against all defendants except Fisch for the retention of the surviving dog; and (4) the Fourth Amendment claim against Fisch and Marinkov for the allegedly coerced inspection of the property and the dog shed.  Judgment will be entered in favor of the defendants on all other claims.

We will issue an appropriate order.


                                                            /s/William W. Caldwell
                                                            William W. Caldwell
                                                            United States District Judge

Date: May 3, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HAROLD DICE, | : | |
| AUDREY DICE, and | | |
| DIANNE DICE, | : | |
|      Plaintiffs | | |
| | : | |
|      vs. | | CIVIL NO. 1:CV-08-0956 |
| | : | |
| CARL JOHNSON, | | |
| BRENDA MARINKOV, | : | |
| JERRY FISCH, | | |
| GREGORY SELTZER, and | : | |
| LIBBY WILLIAMS, | | |
|      Defendants | : | |

*O R D E R*

AND NOW, this 3rd day of May, 2010, in accordance with the
accompanying memorandum, it is ordered that:

    1.  The motions for summary judgment (doc. 42, 46, 48
and 50) filed by the defendants are granted as to all claims by
all plaintiffs against all defendants except for:(a) the
defamation and false light claims against Johnson; (b) the
state-law malicious prosecution claim against Setzer; (c) the
due-process claim by Dianne Dice against all defendants
except Fisch for the retention of the surviving dog; and (d) the
Fourth Amendment claim against Fisch and Marinkov for the
allegedly coerced inspection of the property and the dog shed.

    2.  An appropriate judgment will be entered by order of
court on those claims that did not survive summary judgment
upon resolution of the surviving claims (listed in paragraph 1).


<u>/s/William W. Caldwell</u>
William W. Caldwell
United States District Judge